**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| KENNETH HOUSTON, | ) | CASE NO. 1:20-CV-1371 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Kenneth Houston ("Plaintiff" or "Houston"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I. PROCEDURAL HISTORY

On April 11, 2018, Houstin filed an application for SSI alleging a disability onset date of January 1, 2017, and claiming he was disabled due to acute left knee gout, mental illness, PTSD, high blood pressure, high cholesterol, stress, glaucoma. (Transcript ("Tr.") at 92.) The applications

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

were denied initially and upon reconsideration, and Houston requested a hearing before an administrative law judge ("ALJ"). (Tr.127-9.)

On August 6, 2019, an ALJ held a hearing, during which Houston, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.* at 19-56.) On August 20, 2019, the ALJ issued a written decision finding Houston was not disabled. (*Id.* at 16-28.) The ALJ's decision became final on May 18, 2020, when the Appeals Council declined further review. (*Id.* at 1.)

On June 23, 2020, Houston filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 16, 18.) Houston asserts the following assignments of error:

(1)  Whether the ALJ's Mental RFC is supported by substantial evidence.

(2)  Whether the ALJ erred in the evaluation of the opinion evidence from treating providers Cynthia Vrabel, M.D., and Maureen Sweeney CNP.

(3)  Whether the ALJ erred in his assessment of Mr. Houston's knee pain.

(Doc. No. 1 at 1.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Houston was born in 1964 and was 53 years old at the time of his application, making him an "individual closely approaching advanced age" under social security regulations. (Tr. 26.) *See* 20 C.F.R. §§ 404.1563 & 416.963. He has at least high school education and is able to communicate in English. (*Id.*) He has no past relevant work. (*Id.* at 53.)

**B.     Relevant Medical Evidence[2]**

**1.     Mental Impairments**

In December 2016, less than a month prior to his alleged onset date, Houston sought cre from Frontline Services[3] and Maureen Sweeney, CNP. (*Id.* at 331.) He was diagnosed with Post Traumatic Stress Disorder ("PTSD") and Unspecified Schizophrenia. (*Id.* at 334.) Houston also reported difficulty sleeping and arthritis pain in his knees and hips. (*Id.*) CNP Sweeney prescribed Depakote and Celexa and set appointments to return every six weeks. (*Id.*)

On November 20, 2017, CNP Sweeney noted Houston's mood was stable, but he reported difficulty sleeping due to back pain and trauma related nightmares, which occurred about three times a week. (*Id.* at 369.) He was taking daytime naps due to fatigue. (*Id.*) Houston also reported wearing earplugs throughout the day to block out the noises, and exhibited hypervigilance by checking closets, the space underneath bed, and in the bathroom. (*Id.*) CNP Sweeney noted the trauma related nightmares and hypervigilance in Houston's PTSD diagnosis. (*Id.* at 374.)

On January 8, 2018, Frontline case manager Jarett Carver accompanied Houston to an appointment at the Cleveland Eye Clinic. (*Id.* at 461.) He noted Houston presented with good hygiene, normal speech with full affect, alert and oriented, and good mood. (*Id.*)

On February 22, 2018, Frontline case manager Kayla Aucker accompanied Houston to a doctor's appointment. (*Id.* at 459.) She noted he presented with good hygiene, full affect, friendly demeanor, good mood and eye contact, positive attitude, and his anxiety appeared low. (*Id.*)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3]     Frontline records indicate that Houston began treatment there on January 28, 2008. (Tr. 694.)

On February 22, 2018, Houston saw CNP Sweeney for medication management. (*Id.* at 268.) He reported continued issues with hypervigilance, impacting his sleep and ability to function outside the home. (*Id.*) Houston told her he was working with his landlord to get a peephole for his door, in order to feel safer in his apartment. (*Id.*) CNP Sweeney increased his Celexa and continued his prescription for Depakote. (*Id.*)

On March 21, 2018, case manager Carver met with Houston at his apartment, and noted he presented with good hygiene, normal speech, full affect, alert, oriented, and a good mood. (*Id.* at 462.) Houston expressed gratitude for the support he was receiving, and was excited and somewhat nervous about an upcoming job interview. (*Id.*) Carver noted Houston needed "continued support within community due to [diagnosis] of schizophrenia which can cause paranoia, isolation and decreased motivation." (*Id.*)

On May 31, 2018, Carver accompanied Houston to a dentist appointment, and noted he presented with good hygiene, normal speech, full affect, alert, oriented, and a good mood. (*Id.* at 282.)

On June 11, 2018, Carver accompanied Houston to a primary care appointment, and noted he presented with good hygiene, normal speech, full affect, alert, oriented, and a good mood. (*Id.* at 301.) Houston reported having regular contact with family members including his son, daughter and grandchildren, which was helpful when he feels self-isolating. (*Id.*)

On July 9, 2018, Carver accompanied Houston to a primary care appointment and the justice center, and noted he presented with good hygiene, normal speech, full affect, alert, oriented, and a good mood. (*Id.* at 304.) Houston reported his anxiety felt stable, but he still had periods of feeling overly anxious and worried. (*Id.* at 304.)

4

On July 12, 2018, Carver accompanied Houston to the parole office for his annual assessment, and noted he presented with good hygiene, normal speech, full affect, alert, oriented, and a good mood. (*Id.* at 310.) He reported being medication compliant, but experiencing feelings of anxiety at times, and was keeping to himself and not socializing with others. (*Id*.) Houston rode the bus home. (*Id*.)

On July 25, 2018, Houston saw CNP Sweeney for medication management and evaluation of PTSD. (*Id.* at 289.) He reportedly was no longer obsessively checking locks and doors, but requested a door jam approved from his landlord, and continued to wear ear plugs at night, in order to feel safe. (*Id.*) His hypervigilance remains higher at night, but he was "working on it." (*Id.*)

On April 9, 2019, CNP Sweeney saw Houston after a nine-month gap in treatment and medications related to case management turnover, which had caused him to be off his medications for months. (*Id.* at 679.) Houston stated "I need to get back on my meds," and reported obsessive thoughts, mainly regarding cleaning his apartment. (*Id.*) He stated that he could not stop thinking about bugs in his apartment. (*Id.*) CNP Sweeney indicated that because Houston was aware there were no bugs, his thoughts are more obsessive than delusionally-based. (*Id.* at 679, 684.) CNP Sweeney restarted his prescriptions for Celexa and Depakote. (*Id.* at 684.)

On the same day, CNP Sweeney completed a mental residual functional capacity assessment, which Dr. Cynthia Vrabel signed on April 19, 2019. (*Id.* at 674-75.) They opined Houston was markedly limited in his ability to:

- cooperate with others;

- ask for help when needed;

- handle conflicts with others;

5

- respond to requests, suggestions, criticism, correction, and challenges;

- keep social interactions free from excessive irritability, sensitivity, argumentativeness, or suspiciousness;

- work close to or with others without interrupting or distracting them;

- work a full day without needing more than the allotted number or length of rest periods during the day;

- manage one's psychologically-based symptoms;

- distinguish between acceptable and unacceptable work performances; and

- make plans for oneself independent of others.

(*Id.*) They also opined he was extremely limited in his ability to adapt to changes. (*Id.* at 675.) They noted Houston has been under the care of Frontline Services for more than two years. (*Id.*) Dr. Vrabel and Nurse Sweeney identified PTSD, with severe hypervigilance and anxiety as the medical basis for his work-related limitations. (*Id.*)

On May 10, 2019, case manager Janelle Betty assisted Houston with paying an electric bill after his power had been cut off, and concluded that Houston "continues to benefit from ongoing supportive services in order to keep up with the important tasks and responsibilities that he continues to struggle with due to his PTSD symptoms" (*Id.* at 694.) He anticipated his sister and son would help him pay the rest of the balance due. (*Id.*) A goal was to continue to establish more stability and independence to maintain housing and optimal functioning overall (*Id.*)

Throughout May 2019, case manager Betty assisted Houston in finding a new apartment that did not use Cleveland Public Power as its electricity provider, because he could not afford his power bills. (*Id.* at 696-98.) Houston did find a new apartment that he was enthusiastic about, but decided

to stay in his current building after his landlord came over personally and offered him a larger apartment if he stayed. (*Id.* at 699.)

### 2. Physical Impairments

On January 10, 2017, Houston saw Dr. Daniel Meges at Care Alliance for treatment of right hand swelling due to scratching. (*Id.* at 437.) He was diagnosed with low grade cellulitis. (*Id.*) In addition, a uric acid test was necessary Houston's history of gout. (*Id.*) Houston's uric acid was 4.8 and Dr. Meges found his current medication regimen to be effective against gout, stating "he is very unlikely to have a gout attack at this level" (*Id.*)

On April 30, 2018, Houston sought treatment at Care Alliance for a gout attack in his left knee. (*Id.* at 469.) Houston reported a history of gout, with usual flare sites in both knees. (*Id.*) On examination, his left knee was positive for erythema, diffuse edema, and tenderness. (*Id.*) Belinda Brown, APRN, CNP, diagnosed acute gout of the left knee and prescribed a short course of indomethacin and acetomenophen for pain. (*Id.*)

On June 11, 2018, Houston returned to Dr. Meges, accompanied by case manager, Jarett Carver, to discuss how his knees prevent him from working. (*Id.* at 283.) On examination, the left knee was painful with positive McMurray sign. (*Id.* at 595.) Dr. Meges noted that Houston has a history of torn meniscus of the right knee and pain and swelling of the left knee meniscus that had resolved over eight days in April after treatment with NSAIDS. (*Id.* at 594.) Dr. Meges opined that Houston's uric acid is again likely low and "it is unlikely that his last episode of left knee inflammation was acute gout, an acute meniscus tear could explain it." (*Id.* at 597.) Dr. Meges

indicated any repeated inflammation of the knees should be treated with aspiration[4] instead of a gout diagnosis. (*Id*.)

In August 2018, Houston told case manager Carrver that he was experiencing flare ups with his knees, with swelling and aching, which made it difficult for him to walk and move around for approximately two to three days. (*Id.* at 313, 319, 322.)

**C.**    **State Agency Reports**

**1.**    **Mental Impairments**

On June 4, 2018, State agency reviewing psychologist Todd Finnerty, Psy.D., reviewed the record and opined that Houston's affective disorders resulted in moderate restrictions in the following areas:

- •    ability to understand, remember, or apply information;

- •    ability to interact with others;

- •    ability to concentrate, persist, or maintain pace; and

- •    ability to adapt or manage oneself.

(*Id.* at 83.) Dr. Finnerty opined that Houston was limited to simple, routine type work, with no production quotas for time or quantity and occasional and superficial contact with others. (*Id.* at 87.)

On August 15, 2018, State agency psychologist, Paul Tangeman, Ph.D. reviewed the record and concurred with Dr. Finnerty's opinion. (*Id.* at 295-97.)

---

[4]    Aspiration is a procedure to remove fluid from the space around a joint, and is typically used to relieve swelling and to obtain fluid for analysis to diagnose the cause of the swelling. *See* "Joint Aspiration," National Center for Biotechnology Information, at https://www.ncbi.nlm.nih.gov/books/NBK378787/ (Last visited 6/22/21).

**2.     Physical Impairments**

On June 4, 2018, State agency reviewing physician Maureen Gallagher, D.O., M.P.H., reviewed the file and opined that Houston had the following limitations to his physical residual capacity:

- lifting 50 pounds occasionally, and 25 pounds frequently;

- stand and/or walk for 6 hours in an 8-hour workday;

- sit for 6 hours in an 8-hour workday;

- unlimited balancing, stooping, kneeling, and crouching;

- frequent climbing of ramps and stairs, and crawling; and

- occasional climbing of ladders, ropes, and scaffolds

(*Id.* at 85-86.)

On August 23, 2018, State agency reviewing physician Gail Mutchler, M.D., reviewed the record and concurred with the opinion of Dr. Mutchler, with the following exceptions:

- lift/carry 50 pounds occasionally, and 25 pounds frequently;

- stand and/or walk for 6 hours in an 8-hour workday; and

- sit for 6 hours in an 8-hour workday.

The postural limitations remained the same.  (*Id.* at 100-01.)

**D.     Hearing Testimony**

During the August 6, 2019 hearing, Houston testified to the following:

- He is 54 years old and graduated from high school.  He lives alone and never married.  He has four children.  Three are adults, and one is 12 years old.  That child lives with his mom.  (*Id.* at 40.)

- In 2003, he was homeless and doing a lot of walking with his suitcase and backpack.  That's when his knee started to hurt.  (*Id.* at 41.)

- Walking and standing up are still medical problems that prevent him from working. He can't stand or walk for more than five minutes because his knee "feels like its not together." (*Id.* at 42.)

- He got a ride to the hearing, and will also get picked up. (*Id.* at 43.)

- He goes up and down stairs slowly, and has to keep his leg in a straight position and elevate it while he sits because of the pain in his knee. (*Id.* at 43-4.)

- He carries his own groceries. (*Id.* at 45.)

- He takes medicine for his gout and his mental health conditions. He doesn't need reminders. (*Id.* at 47.)

- He was fired from a previous job because he didn't show up. He can work by himself all right, but if he has to work with other people he doesn't want to be bothered. (*Id.* at 48.)

- Even just having people around him is a problem. One job he was all right in was wrapping boxes in a back room all alone. (*Id.* at 49.)

- His gout flares up in his knee three to four times a year. Sometimes he goes to the hospital to get medication, and other times he just deals with the pain. (*Id.* at 51.)

The ALJ noted that there was no past work to consider. (*Id.* at 53.) The ALJ then posed the following hypothetical question:

[A]ssume a hypothetical individual is capable of medium work, who can frequently climb ramps and stairs, occasionally climb ladders, ropes or scaffolds, frequently crawl, can understand, remember and carry out simple instructions in a routine work setting, can respond appropriately to supervisors, co-workers and work situations if the tasks are performed are goal oriented but not at a production rate pace, and the work does not require more than superficial interaction, meaning that it does not require negotiating with and instructing, persuading or directing the work of others. Is there any work in the economy available for this individual?

(*Id.*)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as packer, cleaner, and laundry worker. (*Id.* at 54.)

Next, the ALJ asked the VE to consider the same hypothetical with the added limitation to light work. (*Id.*) The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as electronics worker, assembler of small products, and inspection worker. (*Id.*)

For the third hypothetical, the ALJ added the limitation that the hypothetical individual would be off task 20% of the time. (*Id.*) The VE testified that this would preclude competitive employment. (*Id.*)

For the fourth hypothetical, the ALJ added the limitation that the hypothetical individual would be absent twice a month on an ongoing basis. (*Id.* at 55.) The VE testified that this make it difficult to sustain competitive employment over time. (*Id.*)

Finally, the VE testified that there were no competitive jobs at any exertional level that could be performed in isolation. (*Id.* at 56.)

### III.  STANDARD FOR DISABILITY

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) & 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) & 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected

to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant has not engaged in substantial gainful activity since April 11, 2018, the application date.

2.      The claimant has the following severe impairments: gout, schizophrenia, post-traumatic stress disorder, and depressive disorder.

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except frequently climb ramps or stairs; occasionally climb ladders, ropes or scaffolds; frequently crawl; can understand, remember, and carry out simple instructions, in a routine work setting; can respond appropriately to supervisors, coworkers, and work

situations if the tasks performed are goal oriented, but not a production rate pace; and the work does not require more than superficial interaction, meaning it does not require negotiating with, instruction, persuading or directing the work of others.

5.  The claimant is unable to perform any past relevant work.

6.  The claimant was born on September 11, 1964 and was 53 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed.

7.  The claimant has at least a high school education and is able to communicate in English.

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since April 11, 2018, the date the application was filed.

(*Id.* at 22-27.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th

Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.       The Mental RFC

Houston asserts that the ALJ's assessment of his mental health limitations was too narrow given the documented extent of his disabilities.  (Doc. No. 16 at 10.)  He notes that the ALJ's determination that he was capable of understanding, remembering, and carrying out simple instructions, in a routine setting, without fast-paced demands, time tasks, or quotas, and with superficial interaction, is inconsistent with the opinion of CNP Sweeney and Psychiatrist Dr. Vrabel. (*Id.*)  Further, he argues that the ALJ's conclusion that he is capable of interacting with others and sustaining competitive employment is also inconsistent with evidence acknowledged by the ALJ, including paranoia, repeated hypervigilence, isolating behaviors, poor sleep, nightmares, and anxiety. (*Id.*)    He asserts that the ALJ's limited analysis of the evidence fails to adequately explain these inherent inconsistencies. (*Id*. at 11.)

The Commissioner responds that, although "the ALJ's articulation of his consideration of the evidence admittedly could have been more robust," the ALJ properly identified evidence supporting his conclusions. (Doc. No. 18 at 11-12.) He asserts the mental RFC was supported by "overwhelmingly normal mental status examination findings, Plaintiff's own reports of improved and stable symptoms with medication treatment, and Plaintiff's routine and conservative mental health treatment course." (*Id.* at 12.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 416.927(d)(3). The ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, and must consider all of a claimant's medically determinable impairments, both individually and in combination.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 880 (N.D. Ohio 2011), citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him."). *See also* SSR 96 8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions. If the RFC

assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).

However, it is well established there the ALJ is note required to discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, No. 16 5175, 2016 WL 4150919, at *6 (6th Cir. Aug. 5, 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin,* No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (accord). "Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, No. 04 5021, 2004 WL 2633448, at *6 (6th Cir. Nov. 18, 2004) , quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) . As another court within this District explained, "an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence." *Vaden v. Berryhill*, No. 1:17CV1656, 2018 WL 4052149 at *4 (N.D. Ohio Aug. 24, 2018), citing 20 C.F.R. § 404.1545(a)(2);  *Thacker,* 99 F. App'x at 665.  *See also Hardman v. Berryhill*, 2018 WL 1545707 at *15 (N.D. Ohio March 15, 2018).

Here, at step two, the ALJ determined Houston suffered from the severe impairments of gout, schizophrenia, post-traumatic stress disorder, and depressive disorder. (Tr. 22.) He also identified non-severe impairments of obesity, mild, stable glaucoma, and hypertension. (*Id.*) As Houston acknowledges, at step four, the ALJ identified a variety of limiting symptoms that Houston experiences, including paranoia, repeated hypervigilence, isolating behaviors, poor sleep, nightmares, and anxiety. (Doc. No. 16 at 10, citing Tr. 25.) He concluded these mental health

symptoms would limit Houston to "simple instructions in a routine work setting; responding appropriately to supervisors, coworkers, and work situations if the tasks performed are goal oriented, but not at a production rate pace; and the work does not require more than superficial interaction." (Tr. 25.)

Houston's assertion that the ALJ primarily identified disabling symptoms in his step four analysis is accurate.[5]  The ALJ noted that medical records showed Houston had "some paranoia, hypervigilance and isolating behaviors," as well as "trouble sleeping, including trauma  related nightmares" as often as three times a week, and "felt anxious sometimes."  (*Id.* at 25.)  This understandably made it difficult to for Houston to identify the basis for the ALJ's assertion that the much more limiting opinion of CNP Sweeney and Psychiatrist Dr. Vrabel is "inconsistent with the record."  (*Id.* at 26.)  However, the ALJ clearly relied on the opinions of the State agency reviewing psychologists, which he deemed "persuasive."  (*Id.* at 25.)  In addition, the ALJ noted that "medications were helpful" in controlling Houston's mental health symptoms, including sleep problems and anxiety, although even with medication, Houston "still felt anxious sometimes."[6]  (*Id.* at 24-5.)  He also noted Houston "had no psychotic symptoms noted during the relevant period."  (*Id.* at 25.)  Further, in his step three analysis, the ALJ noted that Houston "was cooperative at medical appointments," was "medication compliant and his mood was good," and treatment notes

---

[5]     This makes Houston's argument that the ALJ was "selectively parsing that record" for evidence to "contradict the severity of [Houston's] symptoms" unpersuasive, as it is both inaccurate and inconsistent with the argument that the ALJ failed to "build an accurate and logical bridge" between the evidence and his conclusion.  (Doc. No. 16 at 12.)

[6]     The ALJ also noted Houston had increased mood and trauma symptoms when he was off his medications.  (Tr. 25.)

repeatedly describe him as "alert and oriented," with "good" grooming and hygiene. (*Id.* at 23.)

Considering the decision as a whole, the Court finds the ALJ's discussion of the record evidence relating to Houston's physical impairments at step three explains and clarifies the ALJ's RFC and symptom evaluation findings at step four. *See, e.g., Lecea v. Comm'r of Soc. Sec.*, No. 16-cv-10906, 2017 WL 941832 at * 9 (E.D. Mich. Feb. 22, 2017).

Houston also asserts that the ALJ should have inferred a greater level of limitation from the fact that he received case management services. (Doc. No. 16 at 12.) However, Houston's assertion that the ALJ failed to discuss this evidence is inaccurate, as he cited these records numerous times. (Tr. 25.) For example, the ALJ cited the records of Houston's case manager Carver: "In July 2018, claimant indicated he did not socialize with others, and found his medications to be helpful for sleep and reducing his anxiety, though he still felt anxious sometimes." (*Id.* at 25, citing Tr. 310.) However, as the Commissioner notes, the case management notes do not provide an explanation for what services Houston was receiving and why, other than broad statements that Houston needed "continued support within community due to [symptoms] of schizophrenia which can cause paranoia, isolation and decreased motivation," and "continues to benefit from ongoing supportive services in order to keep up with the important tasks and responsibilities that he continues to struggle with due to his PTSD symptoms." (*Id.* at 462, 694.) These statements are not inconsistent with the ALJ's determination that Houston had significant limitations in responding appropriately to supervisors, coworkers, and work situations, could not work at a production rate pace, and was limited to work that does not require more than superficial interaction. (*Id.* at 25.)

The ALJ's assessment meets the standard of minimal articulation of an assessment of the evidence. *See Morris v. Sec'y of H.H.S.*, No. 86 5875, 1988 WL 34109 (E.D. Tenn. Apr. 18, 1988),

19

at *2 ("a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position.") The ALJ's decision makes it clear that he considered Houston's limiting mental health symptoms, including paranoia, hypervigilence, isolating behaviors, trouble sleeping, trauma-related nightmares, and anxiety. (Tr. 25.) Although Houston identifies evidence in contradiction with the ALJ's conclusion that these symptoms are not disabling, the ALJ identified substantial evidence in support of his conclusion, and it is not the role of this Court to re-weigh the evidence. *See Moruzzi v. Comm'r of Soc. Sec.,* 759 F. App'x 396, 406 (6th Cir. 2018) ("We decide only whether there was substantial evidence to support the ALJ's RFC determination. If so, we defer to that decision even in the face of substantial evidence supporting the opposite conclusion.") (internal citations omitted). For these reasons, this Court finds that the ALJ identified substantial evidence in support of his RFC determination, and sufficiently explained his reasoning.

**B.      The Joint Opinion of CNP Sweeney and Psychiatrist Dr. Vrabel**

Houston asserts that the ALJ erred by discounting the joint medical opinion of Houston's mental health provider, CNP Sweeney, and supervising physician Dr. Vrabel. (Doc. No. 16 at 14.) As Houston notes, this opinion found he was markedly limited in many work-related areas of functioning. (*Id.*, citing Tr. 674-75.) The ALJ found this opinion to be "less persuasive," on the basis that it was inconsistent with the record. (*Id.*, citing Tr. 26.) Houston argues this was an error, because CNP Sweeney and Dr. Vrabel were in the best position to properly evaluate Houston's work-related mental capabilities, and offered the only opinion based on the entire record in the case. (*Id*. at 15.)

The Commissioner responds that the ALJ properly considered the opinion under the new regulations set forth in 20 C.F.R. § 416.920c, which require an ALJ to explain how he considered the factors of supportability and consistency. (Doc. No. 18 at 14-15.) He argues that, in addition to being inconsistent with record evidence identified by the ALJ, the check-box form completed by CNP Sweeney and endorsed by Dr. Vrabel failed to explain what Houston can still do despite his impairments or identify work-related functional restrictions, and therefore was "'weak evidence at best' that meets the 'patently deficient standard'." *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 441 (6th Cir. 2017).[7]

Since Houston's claim was filed after March 27, 2017,[8] the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior

---

[7]   The Court will not address the substance of this argument because the ALJ did not provide this rationale when discounting the opinion. The Commissioner cannot cure a deficient opinion by offering explanations never made by the ALJ. As courts within this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Blackburn v. Colvin*, No. 5:12CV2355, 2013 WL 3967282 at *8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin*, No. 1:12 CV 909, 2013 WL 3791439 at *6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, No. 1:10 CV 02936, 2012 WL 253320 at *5 (N.D. Ohio Jan. 26, 2012).

[8]   Houston's claim was filed on April 11, 2018. (Tr. 22.)

administrative medical findings using the factors set forth in the regulations: (1) supportability;[9] (2) consistency;[10] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. §§ 416.920c(a), 404.920(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

---

[9]    The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[10]    The Revised Regulations explain "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019), quoting 20 C.F.R. §§ 404.1520c(a) & (b)(1), 416.920c(a) & (b)(1). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The Social Security Agency's express intention in adopting the Revised Regulations was to re-focus judicial review on the critical issue of whether an ALJ's decision was supported with

substantial evidence.[11]   Therefore, Houston's claim that the ALJ's RFC determination is not

supported by substantial evidence, discussed in section VI.A. *supra*, is intrinsically linked with both

the letter and the intent of the Revised Regulations regarding opinion evidence.

The ALJ analyzed the opinion of CNP Sweeney and Dr. Vrabel as follows:

> Treating providers Cynthia Vrabel, MD, and Maureen Sweeney, CNP on April 9, 2019, opined claimant had mild limitations following 1 or 2 step oral instructions to carry out a task; moderate limitations describing work activity to someone else; moderate limitations asking and answering question and provide explanations [sic]; mild limitations recognizing a mistake and correcting it; moderate limitations identifying and solving problems; moderate limitations sequencing multistep tasks; moderate limitations using reasons and judgment to make work related decisions; marked limitations cooperating with others; marked limitations asking for help when needed; marked limitations handling conflicts with others; moderate limitations stating his own point of view; mild limitations initiating or sustaining conversation; mild limitations understanding and responding to social cues; marked limitations responding to requests, suggestions, criticisms, correction and challenges; marked limitations keeping social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness; mild limitations initiating and performing a task that he understands and knows how to do; moderate limitations working at an appropriate and consistent pace; moderate limitations completing tasks in a timely manner; moderate limitations ignoring or avoiding distractions while working; mild limitations changing activities or work settings without being disruptive; marked limitations working close to or with others without interrupting or distracting them; moderate limitations sustaining an ordinary routine and regular work attendance; marked limitations working a full day without needing more than the allotted number or length of rest periods during the day; moderate limitations responding to demands; extreme limitations adapting to changes; marked limitations managing one's psychologically based symptoms; marked limitations distinguishing between acceptable and unacceptable work performance; moderate limitations setting realistic

---

[11]    The stated rationale for the revision included the concern that:

> Courts reviewing claims under our current rules have focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our final decision. As the Administrative Conference of the United States' (ACUS) Final Report explains, these courts, in reviewing final agency decisions, are reweighing evidence instead of applying the substantial evidence standards of review, which is intended to be highly deferential standard to us.

82 Fed. Reg. at 5853; see 81 Fed. Reg. at 62,572

goals; marked limitations making plans for oneself independent of others; moderate limitations maintaining personal hygiene and attire appropriate to a work setting; and mild limitations being aware of normal hazards and taking appropriate precautions. The undersigned finds this opinion less persuasive, as it is not consistent with the record. Claimant was noted as having some paranoia, hypervigilance and isolating behaviors as well as trouble sleeping. Claimant noted his medications were helpful, though he had some anxiety sometimes. Claimant had no psychotic symptoms noted during the relevant period.

(Tr. 26) (internal citations omitted).

As discussed in the previous section, the ALJ identified substantial evidence in support of his mental RFC determination, including medical treatment records showing that Houston was cooperative, alert, oriented, and in a "good" mood at medical appointments, and was "medication compliant, with "good" grooming and hygiene. (*Id.* at 23.) Further, the records cited by the ALJ document that "medications were helpful" in controlling Houston's mental health symptoms, including sleep problems and anxiety, and Houston "had no psychotic symptoms noted during the relevant period." (*Id.* at 24-5.) All of this is inconsistent with the severe limitations in the opinion CNP Sweeney and Dr. Vrabel.

Houston argues that identifying these inconsistencies was "not only inaccurate, but they cross the line into the ALJ tendency to play doctor." (Doc. No. 16 at 14.) However, numerous case management notes, cited by Houston as evidence of his disability, also contain observations that he regularly presented with good hygiene, full affect, friendly demeanor, good mood and eye contact, positive attitude, and his anxiety appeared low. (*Id.* at 282, 301, 304, 310.) Houston repeatedly reported his anxiety felt stable, although he still had periods of feeling overly anxious and worried. (*Id.* at 304, 310.) He also reported positive relationships with family members, which "is helpful when he feels self-isolating." (*Id.* at 301, 694.) Thus, even Houston's self-reports support the accuracy ALJ's conclusion that his medications were helpful. Further, CNP Sweeney and Nurse

Vrabel authored their opinion after seeing Houston for a single appointment after a nine-month gap in treatment services, during which he was off his medications for months. (*Id.* at 679.) The record from that appointment notes that Houston stated "I need to get back on my meds, and reported "w/o meds mood has been worse," and he was experiencing "obsessive thoughts" that did not seem to be "delusionally based" because he understood they were irrational. (*Id.*) Yet even when unmedicated, CNP Sweeney described Houston as well groomed, engaged, with full affect, organized thought process, no hallucinations, obsessive thoughts, normal speech, partial insight and mildly impaired judgment. (*Id.* at 680-1.) CNP Sweeney also noted "no evidence of psychotic [diagnosis] at this time." (*Id.* at 679.) It is logical to conclude, as the ALJ did, that the opinion authored after that appointment accurately reflected Houston's mental RFC without medication or treatment, but was inconsistent with the record as a whole, which reflected Houston's mental RFC when he was receiving appropriate treatment. Further, Houston does not point to a single record which documents psychotic symptoms, and the ALJ's statement that Houston "had no psychotic symptoms noted during the relevant period," is not an impermissible medical conclusion, but rather an accurate summary of the contents of the record of this case. (*Id.* at 25.)

Houston also asserts that the ALJ erred by finding more persuasive the opinions of the State agency reviewing psychiatrists who did not have an opportunity to review the complete record, including the April 2019 opinion of Dr. Vrabel and Nurse Sweeney. (Doc. No. 16 at 15.) It is well-settled that it is proper for an ALJ to credit a state agency consultant's opinion when it is "supported by the totality of evidence in the record, and the ALJ considered the evidence obtained after the consultant issued his opinion." *Myland v. Comm'r of Soc. Sec.*, No. 17 1592, 2017 WL 5632842 at *2 (6th Cir. Nov. 13, 2017). *See also Glasgow v. Comm'r of Soc. Sec.*, 690 F. App'x 385, 387

(6th Cir. 2017) (even though they did not have access to the entire record, the ALJ properly credited the state agency reviewing physicians' opinions because they were "supported by the totality of the medical and vocational evidence in the record"); *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence developed post-dating those opinions). Here, the ALJ's decision demonstrates he considered the entire record, including the opinion of CNP Sweeney and Dr. Vrabel, which is discussed at length in his decision. (Tr. 26.) Therefore, his reliance on the State agency psychologists' opinions was not an error.

**C.     Evaluation of Houston's Knee Pain**

Houston's third assignment of error asserts that the ALJ erred by failing to evaluate his knee pain consistent with the requirements of Social Security Ruling ("SSR") 16-3p. (Doc. No. 16 at 16-7.) He asserts that ALJ's analysis lacked "appropriate context" and demonstrated a "selective reading of the record in order to support his non disability conclusion." (*Id*. at 17.)

The Commissioner responds that Houston did not meet his burden to demonstrate that his knee impairment was disabling, and therefore the ALJ reasonably concluded that the objective record was inconsistent with his complaints of disabling knee pain. (Doc. No. 18 at 19.) He notes that there are only three relevant medical records relating to Houston's knee pain, and the only opinion evidence was offered by the State agency reviewing physicians, who both found fewer limitations than the ALJ. (*Id.*)

It is well-settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). When a claimant

alleges a symptom so severe that it is disabling, SSR 16-3p instructs the ALJ to follow a two-step process for evaluating these symptoms. *See, e.g, Massey v. Comm'r of Soc. Sec.*, No. 09-6527, 2011 WL 383254 at *3 (6th Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p,[12] 2016 WL 1119029 (March 16, 2016). This test applies to cases where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038 39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 834 (6th Cir. June 2005).

Here, there is no dispute regarding the first step of the test, as the ALJ found that Houston's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. 24.) Despite this finding, he rejected Houston's claim of disability because he found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at 24-5.)

---

[12]     SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the January 23, 2018 hearing.

He explained:

> In January 2017, claimant was noted as having a uric acid level of 4.8, and he was unlikely to have a gout attack at that level and his medications were effective. In June 2018, claimant was noted as having a gout flare, though his uric acid levels were low, and so it is possible his pain was not due to gout. Claimant's gout supports his limitations to medium work with only frequent climbing ramps or stairs; occasional climbing ladders, ropes, or scaffolds and frequent crawling.

(Tr. 25) (internal citations omitted).

The ALJ next considered the only relevant medical opinions, which were provided by the State agency reviewing physicians, and deemed them "only somewhat persuasive as [they do] not take sufficient account of claimant's gout." (*Id.* at 26.) He therefore adopted a physical RFC that had greater limitations relating to Houston's gout than any medical opinion of record.

Houston takes issue with the fact that the ALJ failed to discuss a Care Alliance medical visit that took place on April 30, 2018, at which Houston was diagnosed with acute gout of the left knee and prescribed a short course of indomethacin. (Doc. No. 16 at 17, citing Tr. 469.) He also argues that the ALJ "misconstrued" records from medical visits that indicated Houston's uric acid levels were under control, and therefore his knee pain might have a different cause. (*Id.* at 16.) However, both arguments are unavailing. First, as explained *supra*, it is well-settled that "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, No. 04 5021, 2004 WL 2633448, at *6 (6th Cir. Nov. 18, 2004) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) ). Houston does not explain how a single flair of gout during the relevant period, which appears to have been successfully treated with medication and required no follow-up care, would change the ALJ's functional analysis. Next, Houston's argument that the ALJ improperly dismissed knee pain that occurred when Houston's uric acid level was low is confounding given that Houston does not point

to any evidence establishing that another cause for his pain.  He notes that the treating physician speculated "an acute meniscus tear could explain it," but the record shows no follow-up care to clarify the actual source of Houston's reported pain.[13]  (Doc. No. 16 at 17.)  Further, while the Sixth Circuit "has previously held that subjective complaints of pain may support a claim for disability," it also made clear that "[t]o support such a claim, however, there must be objective medical evidence of an underlying medical condition in the record." *Wyatt v. Sec'y of Health & Hum. Servs.*, 974 F.2d 680, 686 (6th Cir. 1992), citing *Duncan v. Secretary of Health & Human Servs*., 801 F.2d 847, 852 (6th Cir. 1986).  Here, Houston seeks remand because the ALJ failed to find disability based on pain that Houston himself asserts was unrelated to any medical condition that was objectively documented in his treatment records.  This fails to satisfy the initial requirement of the two-step analysis set forth in SSR 16-3p, and therefore the ALJ properly did not further consider knee pain that both the medical records and Houston identify as unrelated to any documented underlying medically determinable physical impairment.  Therefore, this assignment of error is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.


**IT IS SO ORDERED.**



 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: June 25, 2021

---

[13]     For example, the aspiration of Houston's knee joint, recommended by Dr. Menges to determine the cause of Houston's knee pain should it recur, does not appear to have been performed.